[No. G019291. Fourth Dist., Div. Three. July 15, 1997.]

CHARLES McGEE et al., Plaintiffs and Appellants, v.
CITY OF LAGUNA BEACH et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

## COUNSEL

Remer, DiVincenzo & Griffith and Joseph P. DiVincenzo for Plaintiffs and Appellants.

Rutan & Tucker, Philip D. Kohn and Hans Van Ligten for Defendants and Respondents.

## OPINION

**CROSBY, J.**—A senseless accident followed a brief pursuit in which a Laguna Beach motorcycle officer attempted to issue a reckless driving citation to a motorist who was driving in excess of 100 miles per hour on the Santa Ana Freeway. The motorist abruptly exited and drove just as recklessly on a major Irvine thoroughfare. The officer gave up the chase and

slowed down, intending to pull over and communicate the speeding car's description and location to the Irvine police dispatcher. The motorist sped away, ran a red light and rammed plaintiffs' station wagon, leaving a young boy quadriplegic.

We affirm the summary judgment for the City of Laguna Beach (Laguna) and the officer. The Legislature has enacted the pursuit immunity of Vehicle Code section 17004.7 to encourage cities to adopt express guidelines for safe police pursuits, and the city's policy complies with the minimum standards set by the statute.

## I

We consider, as the trial court presumably did, "all of the evidence set forth in the papers." (Code Civ. Proc., § 437c, subd. (c).) On July 11, 1994, Vladimir Anderson, a Laguna officer, was riding a police motorcycle to the Orange County Communications Center to have a broken radio repaired. A malfunctioning cord prevented him from transmitting information through the microphone in his helmet. Although Anderson was not on patrol duty, he wore a uniform and was paid for his time.

Anderson could communicate through a pack set, a portable, belt-mounted radio. It required both hands to operate, making its use impossible while driving.

The officer noticed a blue convertible Mercedes Benz traveling in the neighborhood of 100 miles per hour and making erratic lane changes. He engaged his emergency lights, merged into the number two lane behind the Mercedes, and blew his horn. After about two miles, the Mercedes slowed, cut across three lanes of traffic, and left the freeway at Jeffrey Road in Irvine.

Anderson, hoping the Mercedes would pull over and stop, followed three to four car lengths behind. He did not consider himself in pursuit; he was "attempting to make a traffic stop."

The Mercedes turned left against a red light on the off-ramp and drove around stopped cars. Anderson activated his siren and also turned against the light.

The Mercedes proceeded south on Jeffrey and swerved into the far left lane. It accelerated from 40 to 60 miles per hour through the intersection at Walnut. The Mercedes went left of the intersection, through a painted island, and ran the red light, veering around stopped cars.

Anderson slowed to 20 miles per hour through Walnut against a red light with his siren on. The Mercedes accelerated, its speed topping 80 miles per hour.

The officer sped up, but could not keep pace. He suspected the driver had committed a felony, would not voluntarily stop, and could not be overtaken. He decided to use his portable radio to report the direction of travel and description of the vehicle to the Irvine Police Department. The Mercedes pulled two-tenths of a mile ahead as it neared a major intersection at Jeffrey and Irvine Center Drive. Anderson saw the Mercedes swerve to the far right and enter the intersection. The light was red. He then lost sight of the car.

One witness said the Mercedes sped through the red light "like a shot." It broadsided a station wagon containing plaintiff Cheryl McGee and her two young children. One of the children, seven-year-old Trent McGee, suffered a permanent injury to his spinal cord, which left him without feeling or movement below his neck and permanently connected to a ventilator.

Anderson neither saw nor heard the accident; he only observed a dirt cloud ahead. As he approached the intersection, he was forced to take evasive action when the Mercedes spun around and headed directly towards him in his lane. The Mercedes collided with a concrete barrier, and the driver fled on foot. Anderson was unable to catch him.

Irvine officers apprehended the driver, John Eric Phelps. Phelps had stolen the Mercedes a few days earlier from a Dana Point automotive repair shop.

Plaintiffs sued Phelps, Anderson, and Laguna on tort claims for injuries arising out of the pursuit. They separately sued the repair shop for negligently storing the Mercedes by leaving the keys in the ignition.[1]

Anderson and Laguna moved for summary judgment. Laguna supplied a copy of its 20-page police pursuit policy (General Order No. 83-4) and declarations of Anderson and Laguna Beach Police Chief Neil Purcell. Plaintiffs opposed the motion with depositions of Anderson and Purcell, a declaration from accident eyewitness Linda Pape, and a transcript of Phelps's preliminary hearing from his criminal prosecution. The court granted summary judgment. It found that Vehicle Code section 17004 provided a complete defense to Anderson and the Laguna policy complied with the criteria of Vehicle Code section 17004.7.

---

[1] Plaintiffs' action proceeded to trial against Phelps and the repair shop. Phelps did not appear and presented no defense. In February 1996, a jury returned with a verdict of $38,079,169 against Phelps, but a defense verdict for the repair shop. Plaintiffs have separately appealed from the defense verdict.

## II*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## III

Precisely because the employee immunity in Vehicle Code section 17004 did not extend to public entities, the Legislature in 1987 enacted a new immunity (Veh. Code, § 17004.7) to immunize those public entities that adopt a vehicle pursuit policy "enunciating minimum standards, with specific guidelines which give due considerations to safety concerns." (*Colvin* v. *City of Gardena* (1992) 11 Cal.App.4th 1270, 1288 [15 Cal.Rptr.2d 234]; see also *Kishida* v. *State of California* (1991) 229 Cal.App.3d 329, 336 [280 Cal.Rptr. 62].)

Vehicle Code section 17004.7 immunizes public agencies from liability for injuries caused by suspect-driven vehicles in police pursuits if they adopt written policies that cover four criteria prescribed by the Legislature. These are: (1) supervisory control, (2) responsibility for primary and secondary units, (3) interjurisdictional considerations and (4) when to initiate a pursuit and when to terminate it. We independently determine the legal question whether a particular policy complies with these statutory criteria. (Veh. Code, § 17004.7, subd. (d).)[4]

The immunity is designed to encourage police departments to adopt express safe pursuit guidelines, thereby reducing the frequency of accidents. (*Weiner* v. *City of San Diego* (1991) 229 Cal.App.3d 1203, 1209 [280 Cal.Rptr. 818] [affirming dismissal on demurrer].) It has been held constitutional even though it distinguishes between high-speed pursuits by suspect-driven and police-driven vehicles. The Legislature rationally perceived

---

*See footnote, *ante*, page 537.

[4]Section 17004.7 provides, "(a) The immunity provided by this section is in addition to any other immunity provided by law. The adoption of a policy by a public agency pursuant to this section is discretionary. [¶] (b) A public agency employing peace officers which adopts a written policy on vehicular pursuits complying with subdivision (c) is immune from liability for civil damages for personal injury to or death of any person or damage to property resulting from the collision of a vehicle being operated by an actual or suspected violator of the law who is being, has been, or believes he or she is being or has been, pursued by a peace officer employed by the public entity in a motor vehicle. [¶] (c) If the public entity has adopted a policy for the safe conduct of vehicular pursuits by peace officers, it shall meet all of the following minimum standards: [¶] (1) It provides that, if available, there be supervisory control of the pursuit. [¶] (2) It provides procedures for designating the primary pursuit vehicle and for determining the total number of vehicles to be permitted to participate at one time in the pursuit. [¶] (3) It provides procedures for coordinating operations with other jurisdictions. [¶] (4) It provides guidelines for determining when the interests of public safety and effective law enforcement justify a vehicular pursuit and when a vehicular pursuit should not be initiated or should be terminated. [¶] (d) A determination of whether a policy adopted pursuant to subdivision (c) complies with that subdivision is a question of law for the court."

that "[t]he need for public entity immunity is clearest when an injury is caused by a suspect fleeing from a peace officer of a public agency that has adopted a suitable written pursuit policy." (*Billester* v. *City of Corona* (1994) 26 Cal.App.4th 1107, 1123 [32 Cal.Rptr.2d 121] [affirming summary judgment].)

■ We reject at the outset plaintiffs' contention that the immunity does not apply to police officers who use motorcycles in police chases because the statute speaks about suspects who are pursued by police officers "*in* a motor vehicle." (Veh. Code, § 17004.7, subd. (b), italics added.) While plaintiffs concede motorcycles are "motor vehicles" (Veh. Code, § 400), they contend one can only ride "on" a motorcycle, not "in" one. It is absurd to suggest the Legislature would express so critical a policy judgment by means of a single preposition, particularly where, as respondents point out, California includes motorcycles as appropriate traffic enforcement vehicles. (Veh. Code, § 40800; Cal. Code Regs., tit. 13, §§ 1140, 1141; see also *Ladd* v. *County of San Mateo* (1996) 12 Cal.4th 913, 919-920 [50 Cal.Rptr.2d 309, 911 P.2d 496] [statutory immunity in Government Code section 845.8 for injuries caused "by" a fleeing arrestee also applies with respect to injury caused "to" him].)

## A

The Laguna policy contains none of the deficiencies identified in the reported decisions. (See, e.g., *Berman* v. *City of Daly City* (1993) 21 Cal.App.4th 276, 282-285 [26 Cal.Rptr.2d 493]; *Payne* v. *City of Perris* (1993) 12 Cal.App.4th 1738 [16 Cal.Rptr.2d 143]; *Colvin* v. *City of Gardena*, *supra*, 11 Cal.App.4th at pp. 1281-1287.) Those defective policies contained a common shortcoming: They provided officers little direction concerning how or when to engage in high-speed pursuits, leaving them with " 'what is effectively unbridled officer discretion.' " (*Payne*, *supra*, at p. 1746.) As *Payne* explained, "[a] policy which merely memorializes the unfettered discretion to initiate or terminate a pursuit or which allows each officer to use his or her own subjective standards for determining when a pursuit should be initiated, continued or terminated fails to provide any entity control. It wholly fails to provide any assurance that unnecessarily dangerous pursuits will not be undertaken and does nothing to reduce the frequency of accidents." (*Id.* at p. 1747.)

The Laguna policy provides the guidance envisioned by Vehicle Code section 17004.7. Like the San Diego policy approved in *Weiner* v. *City of San Diego*, *supra*, 229 Cal.App.3d at pages 1208-1211, the Laguna policy lists factors pursuing officers should consider in evaluating whether to begin

or abandon a pursuit. These include seriousness of the offense, time of day, traffic and weather conditions, speed, danger to officers and others, and other methods of arrest. "Equipment malfunction or concerns" are listed among the reasons for discontinuing a pursuit, as is darkness, fog, slick pavement, unfamiliar areas, and the distance between the pursuing officers and the fleeing suspects.

The Corona policy approved in *Billester* v. *City of Corona, supra,* 26 Cal.App.4th at pages 1114-1115 is similar to Laguna's. Both provide supervisory control by requiring the supervisor/watch commander to assume management of the pursuit, to continually assess the situation, and to terminate the pursuit, if appropriate. Again, like the Corona policy, the Laguna policy designates the "primary pursuit vehicle" and its responsibilities, and it clearly limits the number of pursuing "motor units" (clearly including motorcycle units) to two. It states, "There shall be no caravan of pursuing vehicles." We find, as did *Billester,* that such a policy complies with Vehicle Code section 17004.7, subdivision (c)(2). (26 Cal.App.4th at p. 1117.)

■ Plaintiffs claim section 14(B) of the Laguna policy "completely neutralizes" these specific guidelines. They call this a "never mind" clause. Section 14(B) states, "While this policy is intended to provide general guidelines for the safe conduct of police vehicle pursuits, it is recognized that such activities are not always predictable. Therefore, nothing in this policy shall be construed to impose a ministerial duty on any officer of the department, and all related conduct shall be considered discretionary."

Section 14(B) does not render the rest of the policy nugatory. Contrary to plaintiffs' claim, it does not tell officers to use their "sole" or "unfettered" discretion and disregard everything else. As the court in *Bryant* v. *County of Los Angeles* (1994) 26 Cal.App.4th 919, 924 [32 Cal.Rptr.2d 285] recently observed, "The Vehicle Code wisely deals with policy requirements in general terms, leaving the specifics to the *discretion* of well-trained officers who are equipped to deal with such situations as they evolve." (Italics added.)

If anything, section 14(B) reiterates a consistent theme throughout the policy: the individual officer's continuing responsibility to ensure the pursuit does not place in jeopardy "the life of the officer, the violator, or other innocent persons . . . ." Time and again, the policy importunes officers to reflect: "The basic question all officers must address before initiating (or remaining in) a pursuit is 'Are the hazards involved worth it?' " (Original emphasis.) It directs officers to discontinue a pursuit when they have any

"uneasy feelings or second thoughts regarding the pursuit situation" or when they are "uncertain of the performance capabilities of the vehicle(s) in the pursuit in relation to the speeds and other conditions of the pursuit." It ranks the safety of innocent citizens as a higher priority than apprehending violators.[5]

Section 14(B) is a healthy reminder to officers that they are not unthinking, uncaring automatons who undertake "ministerial" functions in the conduct of a pursuit; instead, they must exercise discretion to further the interests underlying the pursuit policy: to preserve innocent life. There is nothing hypocritical in telling police officers to be thoughtful in dealing with the unpredictable where the policy maintains the ultimate objective in focus.

B

Plaintiffs argue any valid pursuit policy must contain a radio communication factor to allow the officer in pursuit to communicate with supervisors, other police units and other jurisdictions. They say, "[A] policy that permits an officer to chase . . . without considering his communications capability and the availability of assistance, does not comply with the immunity statute."

We agree. The legislative requirements would be meaningless if a field officer could fly blind without taking into account a lack of outside contact or supervision and inability to obtain information and assistance. As plaintiffs contend, "[I]t would be remiss of any public entity, and any court, to conclude that the availability and quality of radio communication does not have to be considered by a police officer as a part of his decision to initiate, continue or terminate a pursuit."

---

[5]The policy uses psychology to encourage officers to act cautiously. It appeals to their good judgment by stating, "[i]t takes a great deal of maturity to discontinue a pursuit when the hazards posed to innocent bystanders cannot be justified." It realistically addresses (and discounts) common stereotypes that " 'real cops' don't 'back off' from or 'abort' pursuits. This is unrealistic. . . . No officer of this department will ever be held up to contempt or ridicule, nor will his honor or bravery become suspect, for the exercise of 'common sense' in the performance of his duties. [¶] The key to a successful conclusion of a pursuit and apprehension of evading vehicles is dependent upon proper self-discipline and sound professional judgment." (Original emphasis.)

It even threatens that "Officer(s) directly involved in a vehicle pursuit will be subject to departmental discipline for the continuation of a pursuit when, on the basis of the facts known to the officer and considered with the significant factors set forth in this procedure, a person of reasonable caution would be justified in believing that the level of danger to the community created by the pursuit outweighs the necessity of immediate apprehension, or, if pursuit is continued after it has been ordered terminated."

But the Laguna policy does not suffer from these flaws. It includes communications capability as a *factor* in initiating, continuing, and terminating pursuits. The policy sets forth procedures to notify a dispatcher when a pursuit begins, including the location, direction, description and speed of the vehicle being pursued. It describes the dispatcher's duties and details appropriate radio channels for communicating within a city and outside it. It requires the officer to involve a supervisor or watch commander in determining how many units should join a pursuit and directs the officer to discontinue any pursuit, if so ordered by a supervisor. It tells officers who initiate pursuits outside Laguna to notify the affected jurisdiction by radio; it states such notification shall be made "if possible, prior to entering their jurisdiction . . . ." (Original emphasis.) As plaintiffs themselves point out, "The [Laguna] pursuit policy . . . recognize[s] the link between radio communication and compliance with the immunity statute by providing for radio communication with supervisors, watch commanders, other units and other jurisdictions." That is enough to satisfy the statute.

Plaintiffs say the Laguna policy would have been legally adequate had it included the phrase "availability of assistance" as a factor in initiating pursuits, as did the Corona policy that was upheld in *Billester* v. *City of Corona, supra*, 26 Cal.App.4th at page 1121. But we do not see how the inclusion of the phrase "availability of assistance" provides more guidance than the Laguna policy, which discusses using a radio to secure "additional assistance as needed."

In *Bryant* v. *County of Los Angeles, supra*, 26 Cal.App.4th 919, a motorist was left paralyzed by a thief who stole a deputy's patrol car. The accident happened when other deputies gave chase. The motorist argued the sheriff's policy failed to comply with the immunity statute because " 'it does not take into account the appropriate procedures when a stolen police vehicle is being used by a suspect to escape.' " (*Id.* at p. 922.) *Bryant* declined to impose this level of specificity in Vehicle Code section 17004.7, observing "[n]o sleight of mind or crafty drafting can produce therefrom a requirement that a pursuit policy cover such a specific set of circumstances. . . . [¶] Were policies to contain specific procedures for specific situations, police could end up leafing through a manual before taking any kind of action. In many cases the situation would play itself out, without police intervention, before officers could decipher which response is called for." (26 Cal.App.4th at pp. 922-923; see *Brumer* v. *City of Los Angeles* (1994) 24 Cal.App.4th 983, 988 [29 Cal.Rptr.2d 515] ["We reject the proposition that the only way a pursuit policy can provide guidelines is by listing manifest perils."].)

We find the Laguna guidelines appropriately "control and channel" the pursuing officer's discretion to consider communications as a factor in

continuing a pursuit. The policy expressly includes "equipment malfunction or concerns" as a factor in discontinuing any pursuit.

There are no magic words that validate or discredit a pursuit policy for purposes of the immunity. We reach our decision based upon the *totality* of the 20-page Laguna policy, including its communications component, *and* its repeated emphasis on public and officer safety in balancing the risks of a pursuit against the need to immediately capture an offender. Unlike the inadequate policy in *Colvin* v. *City of Gardena, supra*, 11 Cal.App.4th at pages 1281-1282, the Laguna policy includes criteria to give direction to the officer in the field. It is not "bereft" of guidelines, nor does it "blatantly eschew" setting forth appropriate factors. (*Id.* at p. 1285.)[6]

This case exemplifies the type of high risk, low frequency situation, in which a policy may provide guidance but not categorical direction. We encourage police departments to benefit from the hindsight perspective of the instant accident to strengthen their pursuit policies and training programs in situations when communications capabilities are impaired.[7]

C

Plaintiffs alternatively contend Vehicle Code section 17004.7 requires that any valid police pursuit policy "must contain a prohibition

[6]Plaintiffs concede, as the cases have held, "[t]he extent to which the policy was implemented in general and was followed in the particular pursuit is irrelevant" because "[j]udicial supervision of the implementation of police department pursuit policies would defeat the purpose of the statutory immunity." (*Brumer* v. *City of Los Angeles, supra*, 24 Cal.App.4th at p. 987; *Kishida* v. *State of California, supra*, 229 Cal.App.3d at pp. 334-337.) The United States Supreme Court soon will decide whether a police officer who allegedly violates his department's written pursuit policy may be civilly liable under 42 United States Code section 1983 for a substantive due process violation. (*Lewis* v. *Sacramento County* (9th Cir. 1996) 98 F.3d 434, 442, cert. granted June 2, 1997, __ U.S. __ [117 S.Ct. 2406, 138 L.Ed.2d 173].) In any event, any claim Anderson may have violated the Laguna pursuit policy is not pertinent here. Plaintiff has not pleaded a federal civil rights claim.

Moreover, while one may second-guess Anderson's timing, the evidence does not show he was oblivious to the need to communicate or committed to continue the pursuit at any price. To the contrary, he decided to discontinue the pursuit and use his handheld radio to speak to the Irvine dispatcher.

[7]The "California Law Enforcement Vehicle Pursuit Guidelines 1995" adopted by the Commission on Peace Officer Standards and Training (POST Commission) pursuant to Penal Code section 13519.8 include the following among the sampling of factors to be considered in reaching a decision to pursue: "Quality of radio communications (e.g., out of range, garbled, none)." The POST guidelines similarly include "[l]oss of communications capability" as among the factors to be considered in determining whether to terminate or discontinue a pursuit. In like fashion POST training materials, adopted pursuant to Penal Code section 13519.8 ("California Law Enforcement Vehicle Pursuit Guidelines Training Syllabus 1996") provide, "[t]raining should address whether to terminate or discontinue a pursuit when communications capabilities are lost, delayed or substantially degraded." The inclusion of these more specific factors in police pursuit policies and training is a useful improvement.

against initiating a police pursuit without a functioning radio." Such a prohibition must be "unequivocal."

At oral argument plaintiffs pointed out that the Laguna policy absolutely prohibits pursuits in certain circumstances, such as where there is a non-peace officer (e.g., arrestee, citizen ride-along, or explorer scout) in the officer's vehicle. Plaintiffs argue the same considerations for police vehicles with citizen passengers compel a flat prohibition for police vehicles with impaired communications.

Plaintiffs misperceive our role in reviewing pursuit policies for purposes of the public agency immunity in Vehicle Code section 17004.7. The statute contains incentives for agencies to adopt safe vehicular pursuit policies, " 'while leaving to these agencies the fundamental law enforcement decisions about when to undertake a pursuit . . . .' " (*Kishida* v. *State of California, supra,* 229 Cal.App.3d at p. 335.) Nothing in the statute mandates a categorical rule about radios—or explorer scouts. None of the municipal pursuit policies cited in any of the reported decisions contains a like-worded prohibition, nor do the recently adopted POST pursuit guidelines. To the contrary, their stated intent is "to allow agencies maximum discretion and flexibility in individual policy development."

Laguna may decide to amend its pursuit policy to prohibit any officer with impaired communications capabilities from initiating a pursuit. That may be a wise policy decision and an excellent management tool. But like our colleagues in *Bryant* v. *County of Los Angeles, supra,* 26 Cal.App.4th at page 923, we disavow the temptation "to abandon our role as judges and try to legislate changes to the Vehicle Code and various police practices . . . ." We do not see how public safety will be served if we mandate inflexible, unvarying standards for every jurisdiction and every situation. Our obligation to interpret police policies for purposes of Vehicle Code section 17004.7 does not give us the supervisory power to dictate good (or bad) law enforcement tactics. As observed in *U.S.* v. *Simpson* (9th Cir. 1991) 927 F.2d 1088, 1089, "Judges are not legislators, free to make laws guided only by their moral compass or notions of national interest; nor are they executive officers, vested with discretion over law enforcement policy and decisions."[8]

We reach our conclusions "with some reluctance" because "we understand the impact this ruling" will have on the McGees, who may have "little

---

[8]We echo the sentiments expressed by Judge Trott: "I am not comfortable entombed in the purity of abstractions as we decide . . . whether a tactic used by the police . . . is reasonable. I believe that before judges tucked away behind magnetometers and deputy marshals in the safety of courtrooms tell police officers *and* . . . felony suspects which [police actions] are reasonable and which are not, we must integrate into our decision making process a thorough understanding of the context of the issue and *all* the practical ramifications of our holding . . . ." (*Chew* v. *Gates* (9th Cir. 1994) 27 F.3d 1432, 1463 (conc. and dis. opn. of Trott, J.).)

chance of recovering" from Phelps "who probably has neither significant assets nor insurance coverage for accidents in stolen vehicles." (See *Avis Rent a Car System, Inc.* v. *Superior Court* (1993) 12 Cal.App.4th 221, 233 [15 Cal.Rptr.2d 711].) In the area of tort liability and immunities for public entities, we defer to the policy determinations reached by the Legislature. (See *Osborn* v. *Bank of the United States* (1824) 22 U.S. (9 Wheat.) 738, 866 [6 L.Ed. 204, 234] ["Judicial power is never exercised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect to the will of the Legislature"].)

The judgment is affirmed. The parties shall bear their own costs.

Sills, P. J., and Sonenshine, J., concurred.

A petition for a rehearing was denied August 12, 1997, and appellants' petition for review by the Supreme Court was denied October 29, 1997.