Filed 12/9/25 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MELANIE GILLILAND,<br><br>        Plaintiff and Appellant,<br>v.<br><br>CITY OF PLEASANTON,<br><br>        Defendant and Respondent. | A170666<br><br>(Alameda County<br>Super. Ct. No. RG18924833)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

Respondent City of Pleasanton filed a petition for rehearing of our opinion herein, which was filed on November 19, 2025. In the petition, the City clarified that the scope of the evidence at the bench trial was a subset of the evidence submitted on summary judgment. This clarification does not affect the disposition of this appeal, but we order the opinion modified as follows:

1.     On page 3, footnote 3, delete the second sentence of the footnote. Modify the footnote's first sentence to read, "We draw the facts primarily from Henry's and Officer Harvey's depositions, which were submitted both in conjunction with the City's unsuccessful motion for summary judgment and at the bench trial."

2. On page 4, delete footnote 4. Renumber the subsequent footnotes accordingly.

3. On page 5, line 20, add "during discovery" after "admitted."

4. On page 8, line 2, at the end of the paragraph's last sentence insert, "based on evidence they submitted with their trial briefs. That evidence ultimately comprised a subset of the evidence on summary judgment involving the pursuit issue."

5. On page 8, line 8, insert "Having granted the City's motion in limine to exclude Henry's declaration," at the beginning of the sentence that now begins, "The court then concluded . . ."

6. On page 8, delete footnote 7 (renumbered footnote 6). Renumber the subsequent footnotes accordingly.

7. On page 10, footnote 9 (to be renumbered footnote 7), in the second sentence of the footnote, insert "in his deposition" before "and his conclusory statement."

These modifications do not affect the judgment.

The petition for rehearing is denied. In the petition, the City insists that the opinion "errs by referencing the self-serving crux of the Henry declaration" and "seems to rely on [that] declaration" to reach its holding. But the opinion clearly indicated that we did *not* rely on Henry's declaration to conclude that reversible error occurred. The City appears to believe, incorrectly, that any reference to evidence in the opinion means we *depended on* that evidence to reach our holding. In fact, the declaration is mentioned in the opinion because, among other reasons, the parties' briefing discussed it at length and the trial court addressed it in the challenged order despite excluding it from the bench trial.

The City also claims that the opinion's "extensive recitation of Officer Harvey's assessment of whether a pursuit . . . took place" is "misplaced," because the question was whether Henry perceived that a pursuit was underway. It asks that the opinion be modified to "clarify that the focus of the inquiry under [Vehicle Code] section 17004.7 is that of the *suspect's* state of mind." Again, the City misconstrues the point of the discussion. While the issue here was whether a perceived pursuit occurred, the statute also provides for immunity when an actual pursuit occurs, regardless of what a suspect believes. The fact that Officer Harvey did not initiate a pursuit within the meaning of the City's pursuit policy is relevant to explain why immunity turned solely on whether there was a perceived pursuit. It is also relevant because it distinguishes this case from the far likelier scenario in which immunity is sought because an officer *did* initiate a pursuit, implicating the Legislature's policy goals more strongly than did the situation here.

As a whole, the City's petition ignores the opinion's holding. We held that the trial court applied an incorrect legal standard in ruling that the City was entitled to statutory immunity because Henry believed he was being "pursued." We further held that error was prejudicial because it caused the court to discount as irrelevant evidence about Henry's mind state—which came from his deposition, not his declaration—that *was* relevant under the proper legal standard. Ultimately, the City's consternation about the opinion's discussion of Henry's declaration and Officer Harvey's beliefs falls far short of providing any legitimate basis for rehearing.

Date: _____          _____Humes, P.J.

3

Filed 11/19/25 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MELANIE GILLILAND,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CITY OF PLEASANTON,<br><br>        Defendant and Respondent. | A170666<br><br>(Alameda County<br>Super. Ct. No. RG18924833) |

Plaintiff Melanie Gilliland was severely injured after a car driven by 18-year-old Elijah Henry ran a red light and collided with her vehicle.  At the time, Henry was being followed by Officer Matthew Harvey, a police officer employed by defendant City of Pleasanton.  Gilliland sued Henry and the City for negligence.  After a bench trial on the City's liability only, the trial court concluded the City was not liable under Vehicle Code[1] section 17004.7, which immunizes a public entity from liability for collisions caused by fleeing suspects when the entity has a written policy on "vehicular pursuits" by peace officers and provides regular training on the policy.

On appeal from the judgment entered in the City's favor, Gilliland contends the trial court applied an incorrect legal standard in finding that the collision occurred during a qualifying vehicular pursuit under section 17004.7, subdivision (b)(1) (section 17004.7(b)(1)).  We agree.

---

[1] All further statutory references are to the Vehicle Code unless otherwise noted.

Section 17004.7(b)(1) applies when a suspect either "is being or has been . . . pursued" (an actual pursuit) *or* "believes he or she is being or has been . . . pursued" (a perceived pursuit) by a peace officer. (§ 17004.7(b)(1).) The trial court found that the word "pursued" has two different meanings in this provision. It ruled that Henry was not actually "pursued" because Officer Harvey did not initiate a "pursuit" as defined in the City's vehicular pursuit policy. At the same time, it ruled that Henry believed he was being "pursued" because—under the word's broader ordinary meaning—he thought that Officer Harvey was following him for an investigative purpose.

This case is unusual in that the City seeks statutory immunity based on its vehicular pursuit policy even though it admits that no actual pursuit was initiated—meaning that section 17004.7's main purpose of freeing peace officers to make decisions about initiating or continuing pursuits without worrying about their employer's potential liability does not apply here. (See *Kishida v. State of California* (1991) 229 Cal.App.3d 329, 338.) Under these narrow circumstances, we reach the commonsense holding that "pursued" in section 17004.7(b)(1) has only one meaning. Whether a suspect was actually pursued *and* whether the suspect had a perception of being pursued both turn on the definition of "pursuit" in the public entity's vehicular pursuit policy. Since the trial court disregarded evidence that Henry did not believe he was pursued within the meaning of the City's pursuit policy, which requires that the suspect be "attempting to avoid arrest," Gilliland was deprived of the opportunity to establish that section 17004.7 does not immunize the City because no pursuit of any type occurred. We therefore reverse and remand for the court to apply the correct legal standard.[2]

---

[2] As a result, we need not reach Gilliland's claim that the trial court also erred by determining that the City substantially complied with

# I.
## FACTUAL AND PROCEDURAL
## BACKGROUND[3]

On the afternoon of August 3, 2017, Henry drove himself and three friends from his home in Oakland to a parking lot on Laurel Creek Drive in Pleasanton, an access point for nearby hiking trails. Henry had smoked marijuana earlier that day, and he claimed not to remember what he was doing at that location.

Around 6:50 p.m., Officer Harvey entered the parking lot in his police car to conduct "a patrol check" of the lot, because the area experienced "a lot of vehicle break-ins." He saw Henry's blue Nissan Altima parked a few feet from a dark sedan. Two people were standing between the Altima and the dark sedan, and after seeing the police car they ran to the Altima and entered it. Officer Harvey then noticed the dark sedan had a broken window.

Henry saw the police car enter the parking lot, after which his friends immediately got back into the Altima. Henry was afraid of the police because "sometimes they racially profile black people and . . . suspect us of doing things." He decided to leave the parking lot because he thought Officer Harvey might try to talk to him, and he "just [did not] like being around police officers." Henry specifically denied that he thought the officer was going to try to pull him over or arrest him.

Henry drove the Altima slowly through the parking lot and exited onto Laurel Creek Drive, where the speed limit was 25 miles per hour. In doing

---

section 17004.7's training requirements. We express no opinion on the merits of this claim.

[3] We draw the underlying facts primarily from Henry's and Officer Harvey's depositions and other evidence submitted in conjunction with the City's unsuccessful motion for summary judgment. No new evidence on the "pursuit" requirement was presented at the bench trial.

3

so, he had to drive "straight towards" Officer Harvey, who pulled his car to the side to let the Altima pass. Suspicious that a vehicle burglary had just occurred, Officer Harvey made a U-turn to follow the Altima out of the lot. At this point, the officer intended "to catch up to" the Altima and perform a "traffic stop" to "investigate further."

Henry saw the police car make "a sudden U-turn," which "frightened [him] and caused [him] to accelerate[] quickly" as he drove downhill on Laurel Creek Drive. Henry wanted to "get away" from Officer Harvey, whom he thought "maybe . . . was trying to talk to [him]," but he was unsure if the officer would try to pull him over because the police car "[d]idn't have sirens on or anything."

Officer Harvey saw the Altima "accelerating at a high rate of speed," and it quickly disappeared from his sight after rounding a corner and proceeding down the hill.[4] At this point, the Altima was traveling so fast that the officer did not believe he could "catch up to" it without endangering public safety. He explained, "[I]t was . . . commute traffic hours. We would never initiate a traffic pursuit or . . . drive that fast on the city streets and conduct a pursuit at that time . . . of day. . . . [W]e would not get approved by my supervisor. So it wouldn't even be reasonable to do that."

Since Officer Harvey "did not intend to initiate a vehicle pursuit," he "did not activate [his patrol car's] lights . . . or siren." He informed dispatch that he had possibly "interrupted a vehicle burglary," and he increased his speed to follow the Altima. He testified that he wanted "[t]o try to determine

---

[4] Officer Harvey estimated that the Altima was traveling over 45 miles per hour, possibly as fast as 60 miles per hour. According to an eyewitness whose vehicle was also involved in the collision, the Altima was driving "at least 50 miles per hour" when it entered the intersection.

4

the location that the vehicle was traveling so [he] could put it out over the radio. You can outrun an officer, but you can't outrun a radio."

After accelerating away from the police car, Henry looked in his rearview mirror to check if it was following him. He did not see the other vehicle again until "[r]ight before" he reached the intersection of Laurel Creek Drive and Foothill Road, where the collision occurred. He also never saw the police car's lights and did not hear any sirens before the collision.

As Henry reached the intersection, the traffic light was "yellow, turning red." He decided to enter the intersection to "have more distance between [himself] and the officer," because he "[did not] like police" and did not want to speak to them. Without slowing down, Henry drove into the intersection and hit Gilliland's car. The Altima continued through the intersection and hit another vehicle before stopping.

According to Officer Harvey, he did not regain sight of the Altima until it was "already going through the intersection." Once he saw that a "major collision" had occurred, he activated his vehicle's lights and siren for the first time and proceeded "rapidly" downhill to the intersection.[5]

Henry, who broke his pelvis in the crash, was eventually convicted of a felony DUI offense. As for the possible burglary of the dark sedan, the City admitted that it was never established that a burglary occurred, much less that Henry or any of the Altima's other occupants were involved in it. No one in the Altima was ever charged in connection with any crimes involving the dark sedan.

---

[5] The record is unclear as to the speed at which Officer Harvey was driving, either when he was trying to catch up to the Altima or once he saw the collision, but there is no dispute that at one point he exceeded the speed limit by at least 15 miles per hour.

Gilliland sustained serious injuries in the collision.  She sued the City in October 2018 and added Henry as a co-defendant a few months later.  The operative complaint alleged two causes of action for negligence, one against the City based on Officer Harvey's negligent operation of a motor vehicle and the other against Henry based on his running a red light.[6]

The City answered the complaint and asserted section 17004.7 immunity as an affirmative defense.  It then moved for summary judgment on multiple grounds, including this statutory immunity.  The evidence submitted in connection with the motion included Henry's and Officer Harvey's declarations, excerpts from both men's depositions, and the version of the Pleasanton Police Department's vehicular pursuit policy in effect when the collision occurred (the Policy).

The Policy defines "vehicle pursuit" as "an event involving one or more law enforcement officers attempting to apprehend a suspect, who is attempting to avoid arrest while operating a motor vehicle by using high-speed driving or other evasive tactics, such as driving off a highway, turning suddenly, or driving in a legal manner but willfully failing to yield to an officer's signal to stop."  The Policy permits officers "to initiate a pursuit when it is reasonable to believe that a suspect is attempting to evade arrest or detention by fleeing in a vehicle" and generally requires the use of emergency lights and sirens.  As noted above, Officer Harvey denied initiating a pursuit under the Policy and admitted he never activated his vehicle's lights or siren.  In his declaration, Henry averred that because the patrol car's emergency lights and siren were never activated, he "did not

---

[6] Henry died in September 2022, and his estate was substituted as a defendant.  By stipulation, Gilliland's action against Henry's estate is stayed pending this appeal's resolution.

believe that the police officer . . . was pursuing [him] at any time. If the patrol car had turned on its emergency lights or its siren, then [he] would have stopped the blue Altima immediately." (Some capitalization omitted.)

In December 2019, the trial court denied the City's motion for summary judgment. As relevant here, the court held that the City was not statutorily immune from suit. Relying on the Policy's definition of "vehicle pursuit," the court reasoned that since "Officer Harvey denie[d] he was engaged in a vehicle pursuit of Henry's vehicle or trying to apprehend anyone . . . , and Henry denie[d] that he believed he was being pursued," section 17004.7 did not apply.

After numerous continuances, the trial was rescheduled for fall 2023. The City filed a motion to conduct the trial in phases, with a bench trial on whether it complied with section 17004.7's procedural requirements and the first phase of a jury trial on whether a qualifying vehicular pursuit occurred. Since the City admitted that an actual pursuit did not occur because Officer Harvey testified he did not initiate one under the Policy, the only proposed issue for the initial jury trial was whether Henry "believed he was being, or had been, pursued" by Officer Harvey under section 17004.7(b)(1). Gilliland opposed the motion, noting the trial court had already denied summary judgment to the City based on immunity under section 17004.7.

In October 2023, the trial court—a different judge than the one who denied summary judgment—granted in part the City's motion to try the case in phases. After observing that "[d]enial of summary judgment based on a defense does not mean that it cannot be raised at trial," the court ruled that a bench trial on the City's compliance with section 17004.7's procedural requirements was appropriate because the issue was one of law. (See

7

§ 17004.7, subd. (f).)  Subsequently, the parties agreed that whether a perceived pursuit occurred could also be resolved in the bench trial.

In March 2024, after conducting the trial, a third judge issued a 12-page final order, coming to a different conclusion than the one reached by the judge who ruled against the City on summary judgment.  This judge concluded that the City was immune under section 17004.7.  The trial court first held that the City promulgated a compliant vehicular pursuit policy and provided sufficient and regular training on that policy.  The court then concluded by a preponderance of the evidence that Henry believed he was being "pursued" when the collision occurred.[7]  The following month, the court entered judgment in the City's favor.[8]

After observing that "[s]ection 17004.7 does not define the term 'pursued,' " the trial court determined the word had to "be given its usual and ordinary meaning."  Since there was "no evidence to suggest that Henry, or other [B]ay [A]rea drivers, are likely to be familiar with the [Policy]," the court decided that "the appropriate source from which to determine the meaning of the word" was the dictionary.  The court opined that it was "more reasonable" to "[d]efin[e] 'pursuit' as commonly understood . . . rather than as

_____

[7] Since Gilliland does not raise the issue, we need not decide whether the third judge had the authority to overrule the first judge's conclusion that section 17004.7 did not apply because Henry was not being and did not believe he was being "pursued," given that no new evidence on this point was presented at the bench trial.  (See *Paul Blanco's Good Car Co. Auto Group v. Superior Court* (2020) 56 Cal.App.5th 86, 99–100 [superior court judge cannot overrule another judge's ruling, even if erroneous].)

[8] The trial court certified its written order for writ review under Code of Civil Procedure section 166.1, and Gilliland filed a petition for peremptory or alternative writ of prohibition and/or mandate in this court.  (*Gilliland v. Superior Court*, A170091.)  In May 2024, we summarily denied the petition on the basis that she failed to demonstrate that appeal was an inadequate remedy.

specifically defined in a local agency's policy manual," since the inquiry focused "on the belief of a suspected violator of the law, not the understanding of a trained peace officer. Under these circumstances, it would be odd for a state statute to define 'pursuit' according to a local agency's definition, particularly given that agency definitions could vary among jurisdictions."

Relying on dictionary definitions of "pursue," including "to follow in order to overtake, capture, kill, or defeat" and "to chase," the trial court determined that "[a]s commonly used, . . . the term 'pursuit' is not limited to situations where a command or request to stop has previously been given. And while it may include situations where the pursuer intends to arrest or seize the pursued person or thing, it is not so limited." The court also found persuasive two cases holding that a "pursuit" under a related provision, section 17004, "may include nonemergency, routine situations, including where a peace officer has no intent to take the actual or suspected violator of the law into custody." (Citing *Cruz v. Briseno* (2000) 22 Cal.4th 568, 571; *Moreno v. Quemuel* (2013) 219 Cal.App.4th 914, 921.) Thus, the court concluded that "[b]oth in the colloquial sense and as applied in analogous circumstances, a 'pursuit' by a peace officer may including following a suspect for purposes of investigating, making contact, or issuing a routine citation; an intent to stop, detain[,] or arrest the suspect is not required."

The trial court then found that Henry believed Officer Harvey "was engaged in a 'pursuit' as that term is commonly understood." The court relied on the following evidence. First, Henry saw Officer Harvey "perform a sudden U-turn to follow [the Altima] out of the . . . parking lot" and "became frightened that [the officer] 'was going to follow [him]' and might want to talk to him, so he accelerated quickly to get away." Henry "checked his rearview

9

mirror to see if the patrol car was following him[,] and as he approached the intersection" where the collision occurred, "he could see [the] patrol car behind him." Finally, although Henry testified that "[a]t that point, . . . he did not know whether [Officer] Harvey was trying to pull him over," Henry "was aware he was being followed" and decided to enter the intersection as the light was turning red "to get away from the patrol car." Thus, Henry's "factual admissions" as a whole established that it was "more likely than not that he fled—and entered an intersection against a yellow-turning-red light— because he understood he and his friends were being pursued by law enforcement in an effort to investigate potential criminal activity."

Given its interpretation of the word "pursued" in section 17004.7, the trial court also found insignificant certain evidence on which Gilliland relied. The court found it was "irrelevant" that Officer Harvey "did not signal or activate his lights and sirens, and that [he] denied any intent [to] conduct a traffic stop or arrest Henry," since a "pursuit" does not require a signal for the suspect to stop and can be undertaken merely to investigate. Likewise, the court found "immaterial" Henry's "testimony that he did not fear being 'arrested' by [the officer] . . . and . . . just wanted to avoid having contact with the police." Finally, the court gave "little or no weight" to Henry's declaration statement that he did not believe Officer Harvey was "pursuing" him, because Henry's "belief that he was no[t] being pursued [was] expressly premised upon the fact that [Officer] Harvey had not activated lights and sirens."[9] (Italics omitted.)

<hr />

[9] The parties discuss at length the significance of Henry's declaration, which was apparently prepared as part of settlement discussions with Gilliland. But Gilliland does not claim the trial court erred by discounting Henry's denial of a perceived pursuit while accepting that he "testified truthfully as to specific facts," and his conclusory statement that he did not

## II.
## DISCUSSION

### A.    *General Legal Standards*

Unless "otherwise provided by statute," public entities are "not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person."  (Gov. Code, § 815.) Section 17001 creates an exception to this "general tort immunity" of public entities.  (*Ramirez v. City of Gardena* (2018) 5 Cal.5th 995, 999.)  Under section 17001, "[a] public entity is liable for death or injury to person or property proximately caused by a negligent or wrongful act or omission in the operation of any motor vehicle by an employee of the public entity acting within the scope of [the employee's] employment."

Section 17004.7 limits liability for injuries resulting from the operation of a motor vehicle for public entities who elect to "adopt[] and promulgate[] a written policy on, and provide[] regular and periodic training on an annual basis for, vehicular pursuits."  (§ 17004.7, subds. (a), (b)(1).)  If the policy and training meet the "minimum standards" the statute specifies (§ 17004.7, subds. (c)–(d)), then the public entity "is immune from liability for civil damages for personal injury to or death of any person or damage to property

---

believe Officer Harvey was "pursuing" him does not affect our analysis in any event.

At oral argument, the City's counsel stated that at the bench trial, the trial court found Henry's declaration and "corroborating testimony about it" not credible.  To the extent counsel was suggesting the court found Henry's deposition testimony generally not credible, she was incorrect, as the court explicitly accepted and relied on that testimony to reach its holding.  We disagree with any implication that our opinion's factual background, which summarizes the facts to which Henry testified, improperly includes evidence the court rejected at trial.

11

resulting from the collision of a vehicle being operated by an actual or suspected violator of the law who is being, has been, or believes he or she is being or has been, pursued in a motor vehicle by a peace officer employed by the public entity."  (§ 17004.7(b)(1).)

Section 17004.7 was enacted in 1987 to partially extend to public entities the vehicle-related immunity public employees already enjoyed under section 17004.  (*McGee v. City of Laguna Beach* (1997) 56 Cal.App.4th 537, 542.)  Under section 17004, "[a] public employee is not liable for civil damages on account of personal injury to or death of any person or damage to property resulting from the operation, in the line of duty, of an authorized emergency vehicle while responding to an emergency call or when in the immediate pursuit of an actual or suspected violator of the law, or when responding to but not upon returning from a fire alarm or other emergency call."

"On appeal from a judgment based on a statement of decision after a bench trial, we review the trial court's conclusions of law de novo and its findings of fact for substantial evidence."  (*McPherson v. EF Intercultural Foundation, Inc.* (2020) 47 Cal.App.5th 243, 257.)  As the parties agree, the proper construction of section 17004.7 is a legal issue we independently review.  (See *Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104, 1120.) "In construing a statute, our task is to ascertain the intent of the Legislature so as to effectuate the purpose of the enactment.  [Citation.]  We look first to the words of the statute, which are the most reliable indications of the Legislature's intent.  [Citation.]  We construe the words of a statute in context, and harmonize the various parts of an enactment by considering the provision at issue in the context of the statutory framework as a whole."  (*Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 487.)  When a statute's language is plain, " ' "we need go no further."  [Citation.]  But where

a statute's terms are unclear or ambiguous, we may "look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' " (*People v. Harrison* (2013) 57 Cal.4th 1211, 1221–1222.)

   B.   *An Individual Vehicular Pursuit Policy's Definition of "Pursuit"*
        *Governs Whether Suspects Believed They Were Being "Pursued."*

The trial court correctly observed that section 17004.7 does not define "pursued." But in deciding to apply the word's ordinary meaning to evaluate a suspect's belief, the court overlooked that the statute explicitly refers to (1) the definition of "pursuit" in individual vehicular pursuit policies and (2) state guidelines that likewise define "pursuit." We hold that "pursued" has one meaning as used in section 17004.7(b)(1), and the definition of "pursuit" in a public entity's policy applies not just in determining whether suspects were actually pursued but also in determining whether they believed they were being pursued.

Section 17004.7 provides that to comply with its minimum standards, a public entity's pursuit policy must "[d]etermine under what circumstances to initiate a pursuit. *The policy shall define a 'pursuit,'* articulate the reasons for which a pursuit is authorized, and identify the issues that should be considered in reaching the decision to pursue." (§ 17004.7, subd. (c)(1), italics added.) It is uncontested that an individual policy's definition of "pursuit" governs whether a suspect "[was] being" or "ha[d] been . . . pursued in a motor vehicle by a peace officer," i.e., whether there was an actual pursuit. (§ 17004.7(b)(1).) The City has never disputed that Henry was not actually "pursued" at any time leading up to the collision, because Officer Harvey denied that he ever initiated a pursuit under the Policy. And on appeal, the

13

City explicitly acknowledges that a given pursuit policy's definition of pursuit governs whether suspects were actually being pursued.

Nonetheless, the City claims the trial court correctly determined that a different definition of "pursuit," the word's "plain language, common[]sense . . . meaning," applies to whether suspects *believed* they were being "pursued" under section 17004.7(b)(1), i.e., whether there was a perceived pursuit. We are not convinced.

Generally, "we presume a word or phrase has the same meaning throughout a statute," although this "presumption of consistent usage is rebuttable if the statute displays contrary indications of legislative intent." (*Trejo v. County of Los Angeles* (2020) 50 Cal.App.5th 129, 143–144.) The trial court here gave two reasons for declining to rely on the Policy's definition of "pursuit" to determine what a suspect must believe. The first reason was that the inquiry is subjective and members of the public are generally unaware of local pursuit policies. The second reason was the court's view that "it would be odd" if "pursued" under section 17004.7 was defined at a local level, especially since individual pursuit policies could vary. We find neither of these reasons to be persuasive.

As to the trial court's first reason, we do not see why unfamiliarity with a given pursuit policy would prevent a person from forming a belief about whether a pursuit was occurring. As we have said, the Policy defines "vehicle pursuit" as "an event involving one or more law enforcement officers attempting to apprehend a suspect, who is attempting to avoid arrest while operating a motor vehicle by using high-speed driving or other evasive tactics, such as driving off a highway, turning suddenly, or driving in a legal manner but willfully failing to yield to an officer's signal to stop." Applying this definition to the situation here, for Henry to "believe[] he . . . [was] being

14

or ha[d] been . . . pursued," he merely had to believe that Officer Harvey was trying to apprehend him while he was trying to avoid arrest using some type of evasive driving tactic. (§ 17004.7(b)(1).)

As an aside, while we conclude that a suspect's belief must be evaluated in light of the applicable pursuit policy, we do not mean to suggest that a perceived pursuit can take place only if all of the policy's requirements for conducting a pursuit are satisfied. What matters is the policy's *definition* of pursuit, not the *requirements* the policy may impose for conducting a pursuit. The Policy's definition of "vehicle pursuit" is merely one paragraph of a 13-page document detailing numerous aspects of a pursuit, including when a pursuit should be initiated or terminated, how police units should communicate and interact in a pursuit, and how to address interjurisdictional pursuits. But Gilliland mistakenly focuses on the Policy's requirement that police officers pursuing suspects comply with section 21055, which in turn requires the driver of an emergency vehicle to "sound[] a siren as may be reasonably necessary and the vehicle [to] display[] a lighted red lamp visible from the front." (§ 21055, subd. (b).) According to Gilliland, this means that since Officer Harvey never activated his vehicle's lights or siren, Henry could not have believed he was the subject of a pursuit under the Policy. The City, on the other hand, joined by amicus curiae League of California Cities, contends that Gilliland's interpretation would "categorically exclude immunity for collisions resulting from" a perceived pursuit "unless the officer involved has formally initiated a pursuit in compliance with [the officer's] employer's policy," including by turning on emergency lights and sirens.

We reject Gilliland's argument, because a peace officer need not have fully complied with the applicable pursuit policy for a public entity to be entitled to immunity under section 17004.7. " '[I]f the agency adopts a

15

pursuit policy which meets the statutory requirements, then . . . [t]he extent to which the policy . . . was followed in the particular pursuit is irrelevant.' " (*Nguyen v. City of Westminster* (2002) 103 Cal.App.4th 1161, 1167.) Thus, we agree with the City that interpreting the statute to require lights, sirens, or some other indication to the suspect to stop before there could be a perceived pursuit would be contrary to legislative intent.[10] No doubt such signals will usually be used during a qualifying pursuit, since actual pursuits require them and some perceived pursuits will occur where drivers mistakenly believe themselves to be the targets of actual pursuits. But here, Officer Harvey's omission of a signal to stop is not determinative, since the Policy does not define "pursuit" in relation to how an officer's actual or perceived intent to apprehend the suspect is conveyed.

We therefore turn to the trial court's second reason for not applying the Policy's definition of "pursuit"—its concern about possible variations in local agencies' definitions—and find it also to be unpersuasive. This concern did

---

[10] Senate Bill No. 719 (2005–2006 Reg. Sess.) amended section 17004.7 in response to another aspect of *Nguyen*, the decision's statement that a public entity was entitled to immunity if it merely adopted a vehicular pursuit policy without " 'implement[ing] the policy through training or other means.' " (*Ramirez v. City of Gardena, supra*, 5 Cal.5th at pp. 999–1000, quoting *Nguyen v. City of Westminster, supra*, 103 Cal.App.4th at p. 1168.) Now, an entity must "provide[] regular and periodic training on an annual basis" on its pursuit policy and require officers to "certify in writing that they have received, read, and understand the policy." (§ 17004.7(b)(1)–(2).) But this change in the law does not undermine the principle that an entity may be entitled to immunity even if the collision occurred during a pursuit that violated the requirements of the entity's policy. Indeed, as the City points out, before passing Senate Bill No. 719 "[t]he Legislature expressly considered and rejected conditioning immunity on individual officer compliance with a pursuit policy." (Italics omitted; see Sen. Com. on Judiciary, Analysis of Sen. Bill No. 719 (2005–2006 Reg. Sess.) May 10, 2005, pp. 7–8.)

not prevent the trial court from accepting the City's concession that the Policy's definition governed whether an *actual* pursuit occurred, and we do not see why jurisdictional variations in whether a *perceived* pursuit occurred would be any more objectionable. As we have indicated, a person does not need any specialized knowledge or familiarity with a given policy to be able to perceive the circumstances that would constitute a pursuit under the policy's definition.

Moreover, section 17004.7 incorporates a statewide definition of "pursuit" that makes it unlikely the definition will vary significantly among individual pursuit policies. A compliant policy must provide for "[r]eporting and postpursuit analysis as required by Section 14602.1" (§ 17004.7, subd. (c)(12)), a statute that requires local agencies to report "all motor vehicle pursuit data" to the Department of the California Highway Patrol (CHP) "on a paper or electronic form developed and approved by [CHP]." (§ 14602.1, subd (a).) This requirement, as well as the requirement that a policy define "pursuit" and the other requirements specified in subdivision (c) of section 17004.7, "represent minimum policy standards and do not limit an agency from adopting additional policy requirements. [They] are consistent with the 1995 California Law Enforcement Vehicle Pursuit Guidelines [(Guidelines)] developed by the Commission on Peace Officer Standards and Training [(POST)] . . . that will assist agencies in the development of their pursuit policies." (§ 17004.7, subd. (e).)

Not surprisingly, the Policy's definition of "vehicle pursuit" is basically identical to that in the POST Guidelines and, in turn, the CHP form for reporting pursuit data. In the 2022 POST Guidelines (the current version), "vehicle pursuit" is defined as "an event involving one or more law enforcement officers attempting to apprehend a suspect operating a motor

17

vehicle while the suspect is attempting to avoid arrest by using high-speed or other evasive tactics such as driving off a highway, turning suddenly, or driving in a legal manner but willfully failing to yield to the officer's signal to stop." Although section 14602.1 does not define "pursuit," form CHP 187A— the standard form for reporting pursuits that the Policy explicitly requires to be used—states the 2022 POST Guidelines' definition of "vehicle pursuit" at the top of the form's instructions page to indicate when a report must be submitted.[11]

Thus, by using the POST Guidelines' definition of "vehicle pursuit," the Policy sensibly aligns with section 17004.7's "minimum policy standards" generally and the statute's reporting requirements specifically. (§ 17004.7, subds. (c)(12), (e).) Indeed, as reflected in a chart submitted at the trial court's request, numerous other Alameda County cities also use virtually the same definition in their pursuit policies. Of course, a public entity is not required to use any particular definition of "pursuit," and section 17004.7 explicitly contemplates that an entity can adopt "a policy that limits or restricts pursuits" or goes beyond the statute's minimum standards. (§ 17004.7, subd. (e).) But whatever variances there may be among

---

[11] On our own motion, we take judicial notice of the 2022 POST Guidelines, available at <https://post.ca.gov/portals/0/post_docs/publications/ Vehicle_Pursuit.pdf> (as of Nov. 18, 2025) and form CHP 187A, available at <https://www.chp.ca.gov/siteassets/forms/chp187a-v2.pdf> (as of Nov. 18, 2025). (Evid. Code, §§ 452, subd. (c), 459; see *Riley v. Alameda County Sheriff's Office* (2019) 43 Cal.App.5th 492, 501, fn. 4 [taking judicial notice of POST Guidelines]; *In re Trenton D.* (2015) 242 Cal.App.4th 1319, 1324, fn. 2 [taking judicial notice of Judicial Council form].) Under the same authority, we also take judicial notice of the 1995 POST Guidelines, to which section 17004.7 refers. The 1995 version defines "pursuit" as "the actions of a law enforcement officer to apprehend an offender who is attempting to avoid arrest as demonstrated by evasive driving tactics," which echoes the main components of the current version's definition.

individual pursuit policies, they do not justify applying a different definition of "pursuit" to perceived pursuits than to actual pursuits.  In either case, an individual policy's definition will govern.

Finally, we agree with Gilliland that case law interpreting "pursuit" under section 17004, governing immunity for public employees who were "in the immediate pursuit of an actual or suspected violator of the law," is inapposite.  Having concluded the ordinary meaning of the word should apply, the trial court relied on *Cruz v. Briseno*, *supra*, 22 Cal.4th 568 and *Moreno v. Quemuel*, *supra*, 219 Cal.App.4th 914 to bolster its conclusion that a perceived pursuit requires neither a request to stop nor an intent to arrest. It may be that as used in section 17004, the word "pursuit" is "susceptible to more than one meaning" and requires "resort to extrinsic aids to construe it" (*Moreno*, at p. 919), but section 17004.7 explicitly refers to other sources defining the word that establish it has a specialized meaning.  Moreover, sections 17004 and 17004.7 convey immunity to different parties and in only partially overlapping circumstances.  Section 17004 broadly immunizes public employees from liability for negligently operating an emergency vehicle, not just driving it (much less driving it in a pursuit).  (See *Moreno*, at pp. 916–917, 920 [statute applied where officer opened his car door into passing motorcyclist]; see also *Cruz*, at p. 572 [statute applied where officer was attempting non-emergency traffic stop].)  Immunity under section 17004.7, however, turns on a public entity's adopting and implementing a pursuit policy that complies with several requirements aimed at balancing "the apparent need for immediate capture against the risks to peace officers, innocent motorists, and others" who might be endangered during vehicular pursuits.  (§ 17004.7, subd. (c)(1).)  Thus, it is reasonable to define suspects' belief that they are being "pursued" under

19

section 17004.7(b)(1) more narrowly, based on the applicable pursuit policy and not the word's ordinary meaning.

Having determined that the trial court misinterpreted section 17004.7, we further conclude that the misinterpretation was prejudicial because there is a reasonable probability Gilliland would have obtained a better result had the court used the correct legal standard. (See *Orange County Water District v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 313–314; *Navigators Specialty Ins. Co. v. Moorefield Construction, Inc.* (2016) 6 Cal.App.5th 1258, 1287.) The Policy's definition of "pursuit" requires both that a police officer be "attempting to apprehend a suspect" and that the suspect be "attempting to avoid arrest." Applying the ordinary meaning of pursuit, however, the court found it irrelevant that Henry testified he did not believe Officer Harvey was trying to arrest him. Since that testimony, if accepted, would establish Henry did *not* believe he was being "pursued" under section 17004.7(b)(1), the matter must be remanded for the court to use the appropriate standard to decide whether the City is entitled to immunity.

In closing, we emphasize that section 17004.7 immunizes public entities from suit in relatively narrow circumstances if they have adopted and implemented a vehicular pursuit policy. Thus, even if a public entity is not entitled to statutory immunity because an actual or perceived pursuit did not occur, it hardly follows that the entity will be found liable for damages resulting from a collision in which a peace officer might have played a role. Here, the City may ultimately prevail on other grounds, and we hold only that section 17004.7 does not apply merely because Henry believed Officer Harvey was following him for some type of investigative purpose.

20

### III.
#### DISPOSITION

The judgment is reversed, and the matter is remanded for further proceedings consistent with this opinion. Gilliland is awarded her costs on appeal.

_____

Humes, P.J.


WE CONCUR:



_____

Langhorne Wilson, J.



_____

Smiley, J.


*Gilliland v. City of Pleasanton*  A170666


22

Trial Court:

Superior Court of the County of Alameda


Trial Judge:

Hon. Jenna M. Whitman


Counsel:

Altair Law LLP, Craig M. Peters; Law Office of Ted W. Pelletier, Ted W. Pelletier; Law Offices of Joseph E. Tomasik, Joseph E. Tomasik, for Plaintiff and Appellant

Bertrand Fox Elliot Osman + Wenzel, Richard W. Osman, Sheila D. Crawford; Miller Barondess, LLP, Nadia A. Sarkis, for Defendant and Respondent

Cole Huber, LLP, Derek P. Cole, Tyler J. Sherman, for Amicus Curiae in support of Defendant and Respondent

*Gilliland v. City of Pleasanton*  A170666